Good morning. May it please the Court. My name is Jason Hannan, and I represent the defendants in this case, the defendants whose guilty pleas were taken en masse, 50 defendants at one time, in taking their plea of guilty, in violation of due process and Rule 11. Do you know, and I'll ask the other side the same question, do you know of any other court that has done en masse guilty pleas like this? Your Honor, I would submit that it's such a radical idea that it hasn't even appeared before them, but I know of no cases in any circuit or the Supreme Court that has dealt with this type of guilty plea. Well, yeah, I'm not quite — that's not quite the question I asked you, not whether there have been any cases dealing with it. I asked, do you know of any other instances or any other districts and so on that have done this? Your Honor, the only cases that — I don't think they come close, but there are some cases in some other circuits where there are a couple of co-defendants who were dealt with at one time. Okay. Yeah. Those were — those were United States v. Fels, Hobson, Martinez-Martinez. But as far as this number of defendants, as far as not actually eliciting an individual response in the record, there are no such cases. There's none that you're aware of? Correct, Your Honor. None that I am aware of. Can I ask you another preliminary question? It may be easily answered, but it occurred to me as I saw the position of your clients, why are these cases not moot? In what respect, Your Honor? Moot as far as — Well, people have gone to Mexico. They're not going to suffer imprisonment. Well, Your Honor, what is the consequence for them of these convictions? Your Honor, the criminal conviction itself, which is unconstitutional — which was taken unconstitutionally and in violation of Rule 11, provides the prejudice to the defendant. Why does it if they stay in Mexico? If they stay in Mexico, certainly there's not going to be other consequences. But the fact is they can't even solicit. Because of the criminal conviction, they end up getting deported. A voluntary return is not permitted, and they can't even solicit. They went. They're gone. That happened. And I think you have some problem showing that there are consequences. You made no showing that they wanted to come back. Well, Your Honor, I — the criminal conviction itself, there — no, that's no — it's over. The consequence was imprisonment as the time served. So the question is, what are the adverse consequences that flow from the fact of conviction? The consequences that occurred, Your Honor, are that the defendant cannot apply for permission to come into the United States. Does he want to? Well, we don't know, Your Honor. No. No. Although I think we can guess, given that he was here already illegally once. We could guess. For three times. But, you know, cases can't be just made up for the purpose of getting an advisory opinion. You've got to have real consequences. And there are, Your Honor. The defendants cannot come back to the United States. They will get a felony offense if they come back to the United States. Do they want to come back? You can guess. I can guess, but nobody knows. If they apply and come in legally, can they come back? Sure. They cannot apply for — they've been deported. It's either going to be five years or ten years that they can't apply to come to the United States. Well, anyway, that's a preliminary question and go on with the argument. Neither side raises it, but it certainly occurred to me. Yes. Thank you. Your Honors, the basic problems with the guilty pleas here, and the first one, is just simply that there is no individual answer of each defendant elicited on the record to provide satisfaction of the constitutional rights under Boykin as well as the requirements under Rule 11. In this case, the judge accepted the guilty pleas of the defendants. She found they were knowing, intelligent, and voluntary, even though the only two words she elicited from them were present and guilty. The rest of the words, the remainder of the responses on the record, are general yes response, general no response. And how many defendants and how many lawyers were there in the room during the period when we had everybody there? I understand there were some later sort of separate deals, but when everybody was there, and I gather we have two different days in which this happens. So how many defendants, how many lawyers on each of the two occasions? I believe the first day was 47 defendants, and each attorney had to represent approximately five or six defendants at once. On the second day, I believe it was exactly 50 defendants, and I believe the number of attorneys might have been a little bit higher, perhaps 12.  And I gather from what the district judge says, and there's no reason to disagree with this, that these are not English speakers. These defendants are not English speakers. Correct, Your Honor. And how was the translation done? Was it a single translator? The judge speaks, the translator says something standing next to the judge. I mean, how was that done physically? The interpreter would be over here, say, and when the 50, presumably, who knows how many defendants, give a vocalization, a response to the court all at one time, what the interpreter literally put into the record is general yes response, general no response. As Judge Jorgensen found in her ---- And again, I think I know this, but I want to make sure I get you telling me, and the other side can say what he or she saw. We're not going sort of person by person, yes. So it's possible that there was a loud yes and that on the second day when there were 50 people there, 45 people said yes, 5 people said nothing, that 5 people said no under their breath. We don't know. Yeah, and Judge Jorgensen found exactly that. There's no way to discern who exactly is answering. She said that the appellants are correct, that there's no way to tell if any individual is answering, but there is a general yes response. The cases from the other circuits that only involve just a couple of co-defendants are very important because those cases actually only allow even just a couple of co-defendants because it's stated the individual response of the defendant was placed on the record. So those cases are actually in favor of the defendants here. They require an individual response in the record. That's from the defendant back to the judge. Additionally, there's plenty of Ninth Circuit case law, Kamer, Smith, requiring that it must be the defendant's answer on the record. When we're talking about constitutional rights, we're talking about the intentional relinquishment of a right. An ambiguity such as having no idea if a person even understands is certainly not an intentional relinquishment of a right. The Court is supposed to indulge every reasonable presumption against waiver. The Court used sit-up, stand-down or stand-up, sit-down procedures as well so that a person could remain absolutely immobile, silent, and it is assumed that they understand their rights. It is assumed that they are waiving their rights. That process was even struck down in the civil deportation context. So we have the failure to elicit individual answers. We have the stand-up, sit-down procedure. And then finally, Your Honors, under Rule 11, Rule 11 has a two-part inquiry. The communication is required to be personal, from the defendant to the judge, judge to the defendant. The rule reads that before accepting the plea of guilty, the Court must address the defendant personally, must inform the defendant and determine that the defendant understands. If the rule requires that the defendant understands be done individually, personally cannot be read differently in the context of how the Court addresses a defendant. The government makes an argument that the word personally there is inserted into Rule 11 in order to make clear that the judge shouldn't be communicating with the lawyer. But according to the government, personally is taken care of so long as the communication is not through the lawyer, even though it goes to 50 people. How do you respond? Your Honor, that definition provides no limitation. It literally can be 50, 70, 100, 200 people, as long as the Court is speaking to the defendants. That does not limit the rule. And they got that argument from Judge Jorgensen, who looked at the word personally in the dictionary. But she didn't look at the word personal, and it stated of or to a particular person, private, intimate. Those words better describe what we're talking about personally. What is the purpose of the Rule 11 colloquy? It's to put the state of mind of the defendant on the record. It's to assess him individually. Here's where the sticking point is for me, and I'd just say it quite openly. I'm not sure I've made up my mind on the point. Assuming that I agree with you that there has been a violation of Rule 11, and second that I agree with you that there's been a violation of due process, why are not these violations harmless? Your Honor, the due process error is certainly more difficult for the government to show that it's not reversible. We make two arguments in the reply brief. And if it's a due process violation, what's the standard by which we judge harmlessness? The first argument we make is that it is automatically reversible under McCarthy. Secondly, it is a constitutional error, so, therefore, the government must prove beyond a reasonable doubt that the error was harmless. Now, on the second day, you state you have no doubt about what your clients basically understood everything and would have pled guilty. So that's the harder one for you, even under that standard. Why is that not a harmless error, given what you yourself said about your client's state of mind? Well, Your Honor, all the court asked me was my opinion. She did not go over the specific rights I had gone over. It's not on the record. Which rights did you go over with your client? Yeah, but, of course, you understood. I mean, the question was not to a lawyer. That question is not an ambiguous question. But, Your Honor, the case law actually requires that where the court is trying to address through counsel. Well, actually, the advisory committee notes that the court just spoke about in McCarthy that it's supposedly you have to address the defendant personally. Here we have the court addressing not the defendants, but counsel, which is supposedly the argument the government makes for March 5th as to the meaning of personally. So, actually, March 6th, now we have. But here the question is not violation. The question is harmlessness. So if I know, however I know, that as to the second, I think it's the second where you said, listen, I really have no doubt about this as to my own clients. Assume I'm willing to fine for the purpose of this question violation. The question is, was there some harm because of it? Was there some adverse consequence? You state to the judge, no. Well, I don't, Your Honor. This is at the outset of the proceeding. The court is asking me, is there an objection to a group proceeding? The answer is yes. Then the court turns to me and asks me, well, have you done what's required, basically, by your job? And the answer is yes. I'm not going to tender, no defense attorney I would hope is going to tender a defendant to the court that it thinks can't enter a knowing, intelligent, voluntary plea if the court does its job. Rule 11 addresses itself to what? So your answer is, now you wish to sort of, as they say for the congressional review, revise and extend your remarks. But basically what you're saying is, I had a conversation with my client, and here's what my client told me. However, that's not the same as the conversation my client was supposed to have with you, Your Honor. Well, absolutely not. And the Rule 11 addresses itself to the requirements of the court, not the requirements of defense counsel. There are a line of cases in the Ninth Circuit that say that unless all of the attorney's advice and the client's answers underlying that opinion are placed on the record to satisfy the colloquy requirements, then there is not a showing of knowing, intelligent, and voluntary plea. I believe there's plenty of case law there for the court to say what the defense attorney's opinion happens to be. I'm asking for an individual assessment. I'm basically asking the court to do that in this case, so that I can do my job well, so that the court can do its job, and it's what is required under Rule 11. We don't know what happens at a change of plea. You can see how many times we end up with a defendant. He ends up right in front of the court, and suddenly it's like, well, you didn't understand that. Or his nonverbal behavior shows that he's got hesitancy. None of this comes out. And it's because of the colloquy between the court and the defendant and what's required that comes out. I'm stewing on this. It may be that if we're talking the due process violation, the harm is the violation of due process rather than the erroneous underlying determination. And the violation of due process is the failure to conduct the individualized inquiry, and the only way you cure that is by having the individualized inquiry. Otherwise, you have a violation of due process, period. That's the argument. Yes, Your Honor. And this case is incredibly different from Dominguez-Benitez. Here we have doubts about whether the plea was knowing, intelligent, and voluntary. That doubt, even post-Dominguez-Benitez, this Court has a case, United States v. Adams, Ninth Circuit case from 2006, post-Dominguez-Benitez. It states where there's unclear, the defendant's plea is knowing, intelligent, and voluntary. That affects the substantial rights of the defendant. And why wouldn't you go from, correct me. The doubt that you're talking about arose after your statement to the judge about your opinion? Well, Your Honor, the doubt is that you decided to have a doubt, is that correct? Well, certainly, no, Your Honor. This proceeding, the initial appearance, change of plea, sentencing, it's all put together, good time served, deported. That procedure alone doesn't permit me to talk to the defendant, figure out, well, between the time, when was I supposed to file the motion to withdraw the plea of guilty? The Court, the objection was laid. The Court sentenced them en masse. Does it change the plea en masse? So the Court actually alters the procedures in this case. And I make a case for structural error as well. Structural error, due process error, that certainly even takes us out of the Dominguez-Benitez analysis. The procedures the Court used cannot result in a reliable determination. Group guilt, group waivers of rights on behalf of multiple defendants by multiple attorneys, a guilty plea involving 50 people undermines any confidence that we have in the reliability of that determination. How would it be your best Supreme Court case that would furnish analogy on structural error? Your Honor, the – I believe it's the Nieder talks about whether the procedures used were an unreliable vehicle for determining guilt, undermines confidence in the truth-seeking function. There's also Gonzales-Lopez. In other words, it affects the entire adjudicatory framework is the phrase they use. These procedures that were used certainly do that. It's not a question of just implementing the rules or making an error in implementing the rule. The rules have been altered by the Court. It's using different procedures. This is a radical departure from individual determination of guilt. So I believe that – in fact, Dominguez-Benitez itself, though, states in several of the footnotes that when the – when there's a question about the knowing, intelligent, voluntary plea, this is – this is not Dominguez-Benitez. They state it doesn't matter how much proof the government can come up with about what they would have done in the absence of error, because it's really the knowing, intelligent, voluntary plea in the first place that needs to be addressed. And if I may, if I may, I'll reserve some time for rebuttal. Roberts. Yes, please. Thank you. Let's hear from the government, please. Good morning. May it please the Court. I'm Bob Misko from the United States Attorney's Office in Tucson on behalf of the government, and I'd like to reserve about three minutes for rebuttal on the cross appeal. Oh, okay. This case is basically a Rule 11 case. Well, you say so. It looks like a due process case, too, to me. I mean, you could argue that there's no due process violation. I assume it's a fair argument, but due process is on the table. I would suggest that if, in fact, Rule 11 is complied with, the requirements of due process are complied with, because there seems to be pretty much no disagreement with the idea that the Rule 11 incorporates what due process requires. Well, but your version of Rule 11 seems to me to say that Rule 11 and that personal word in Rule 11 is complied with if there are 1,000 defendants in the room, so long as the judge is speaking directly to the 1,000 defendants. That's your reading of Rule 11. I am not suggesting that you could push Rule 11 to 1,000 defendants, Your Honor. But that's certainly your reading of the rule personally. I — the government's position is personally does not mean individually. Okay. So what in Rule 11 says that you can't have the judge addressing 1,000 defendants in the room without talking through the lawyer? I think when you're talking personally, the group at some point gets too large for the judge to make the determinations the judge needs to be making. Ah, okay. So in other words, you're walking away from the argument you made in your brief. No, I'm not. So 50 is enough for the judge individually to determine? I think it's up to the judge to determine what they feel that they can handle, where they can see, hear what's going on in their courtroom. Okay. How could a judge see and hear what 50 people or 47 people were saying or doing? I look out there, and my eyesight's not that good, but I don't think anybody from here could tell what all these people are doing, and they're not 40 or 50. I think, first of all, actually, to go back to the question you asked initially Or stick with Judge Nunez. Okay. I'm sorry. I'll ask. Sorry. I'm asking you, how is it physically possible for the judge to do what you say the judge did, hear and see the responses? The ability to handle this type of proceeding with multiple defendants. No. No. No. Let's focus on the thing. How could he hear them? How could he see them? Answer that and those two questions. The judge certainly could see them from in that position in the courtroom. But could he see 50 people at once? Sure. And I would say so, yes. How could he see the reactions of 50 people? The judge is on an elderly. I mean, how could he? By scanning the room to see what's going on. You can tell in these proceedings. But it's only about a second that the person has to respond. Right. How could his eyes travel that fast? Again, you look at the person, what's going on in the courtroom. You can tell when you're in the courtroom if there's a problem with somebody. I mean, you see that. You can see that in the courtroom if there's a problem with somebody. You can see what's going on. You're able to focus on them. And how do you hear them? Well, again, you – I think in one place on the record, and maybe let me – the If they hear a yes response from – So you're dependent on what the interpreter says. Well, no. Yes. Excuse me. Yes, you're always dependent on what the interpreter says when you have an interpreter. Says a general yes. General yes. There is indications on the record where there is something other than a general yes where the interpreter says, in one case it was the interpreter said that the responses were, I think so, and there was some, could that be repeated. So in that situation, the judge decided to make sure there was no problem, repeated the question, made sure everybody understood. Repeatedly through the proceeding, the judge was asking, does everybody understand? Does everybody hear what I'm saying? Is there any problem you don't understand? If you don't understand, stand up. Well, he certainly did it, but sometimes. I don't think he did it consistently. It was – I would say it was repeatedly throughout the hearing. And now going back to your initial question, these type of proceedings are done in at least four other places that I'm aware of along the border, Yuma, El Paso, Laredo, and one other city on the Texas border that I can't. And do you know, and I don't want to turn you into a witness, how long ago this became a practice? It initially started maybe three years ago, maybe a little longer than that. But at the same time, multiple defendant changes of plea, I know, again, not of this scale, but multiple defendant changes of plea have been going on in Tucson at least since 1990 when I started in the office up there. Well, we – you know, it's a pretty well-established law that we can do this with multiple defendants, but that tends to be, you know, two, three, you know, we're not talking about a roomful. Right. And so then, as I said, if you look at the facts of this case, and you look at the record, and you look at the entire record, what you have here is a situation where there is absolutely no indication that the result of the proceeding would have been different if the Court had conducted the hearing the way defense counsel says it should have been conducted. Now, you say no indication. Well, one of the reasons we have no indication is they conducted the hearing the way they did. But what you have on its face, the record indicates that the rule 11 colloquy was complied with, that the defendant's ---- That's what you said. That's your position. I understand your position. Okay. Let me be more exact. The judge asked all the correct questions for Rule 11 colloquy. There you go. There were general yes responses where appropriate, general no responses where appropriate. There is no indication that there was anything other than a general yes response or a general no response. The defendants were all told to stand if at any time they didn't understand something. Clearly, the magistrate says she's relying on both visual and verbal cues from the defendants to make sure she's comfortable with what's going on. The magistrate ---- the record reflects the magistrate was very aware of what was going on in the courtroom. If you read the transcript, she is catching when something's not working right or when something's out of place. More importantly, after you've got on its face Rule 11 is complied with, you've got nothing from the defendants or the defense counsel themselves suggesting the defendants wouldn't have pled guilty. The counsel indicated that they believed the clients were competent in pleading voluntarily. No counsel objected when the court asked if there was a legal reason not to accept the plea. There was a complete absence of any facts that defendants would not have pled guilty if the proceeding had been different. Even on that March 5th ---- Kagan. Let me ask you this, and you may not know the answer to this. It may be better directed to Mr. Hannan, but I'll try it first with you. Do you know how much time these lawyers had spent with their clients before this mass plea takes place? I know my understanding is the defendants are split into two groups. I believe at that time the defense attorneys had from 9 to 1030 with one group and from 1030 to noontime with the second group. So they had an hour and a half with each group of defendants. And how large is a group per attorney? I ---- on March 5th, there was eight attorneys representing 47 defendants. On March 6th, there was 12 attorneys representing 50 defendants. So and each group is then, roughly speaking, how many defendants per lawyer? That I don't know. Well, you can do the math for me. How often do you do these unmasked procedures? Monday through Friday. I mean, every day. What I'm driving at is not only what's going on in the room, but I'm trying to figure out how much protection is being provided by the lawyers. Like, do they know their clients? And it sounds as though they don't know them very well. On, to guess your mathematical question, on the first day it was about six per attorney. Six per attorney for the morning.  Is that what you're saying? That's the part I don't know how they split up into two groups. I see. Okay. Okay. And on the second day, March 6th, it averages out to just over four in attorney. Okay. So they might have had, and this is a might have, and I don't want to push these numbers too hard and rely on them, but just trying to get a general sense. An attorney might have had three defendants and an hour and a half for all three divided up. So half an hour per, roughly. Seemably. Yeah. Okay. I mean, I can't, there's nothing in the record, obviously, one way or another. And I don't want to push you too hard, and I don't want to be reliant. I just want to get a general sense as to how much these lawyers are likely to have known about their clients at the time they stand up in the, with the 50, in the mass plea. Yeah. So, and again, going back to, I think the fact that there are attorneys provide, does provide an important protection. And it's what differentiates this proceeding from the deportation proceedings that the defense counsel talked about. So. And you say these happen every day? Yes. Oh, boy. And again, to maybe even expand a little bit more, this is at the same time, well, not at the same time, but on the same day, on any given day, there could be another 12 or 15 defendants doing misdemeanor pleas as a group in another magistrate courtroom on slightly more serious offenses. But still misdemeanor pleas for the most part, or for actually all misdemeanor pleas. So there is, there is these things, these proceedings. And again, that also indicates the practice that the magistrate judges get with these proceedings. They do get good at it, basically. Who gets good at it? The magistrates get good. Yeah. I'm not worried about the magistrate. I'm worried about the defendants. Well, the magistrates get very good at protecting the defendant's rights. I see. In concert with the defense attorneys. I mean, you look at, again, looking at the whole record, on March 5th, you have the defendants questioned separately at the end of the proceeding. The defendants are at issue here in these appeals. And again, there's no indication that they don't want to plead, that they didn't understand what was going on. Even when they're being questioned individually, there's no suggestion that they didn't want to plead guilty. And that they weren't, in fact, there's never been any suggestion that they weren't, in fact, guilty. And there's no suggestion that they didn't understand what was going on. You would think if there was a problem, there would be some indication of that somewhere in the record. And the record is absolutely devoid of that, which, when you can combine it with the fact that rule of the transcript reveals that Rule 11 on its face was complied with, there is absolutely no indication. Well, Rule 11 was complied with in the sense that you specified, the district judge or the magistrate judge is asking the right questions. And getting general yes and general no responses. That's the question, whether the general yes or whatever it is, is compliance. I mean, that's at issue. Okay. Yeah. And is your argument that even if the procedure was bad, it was saved as to these particular defendants, whether subsequent colloquy? I think it was saved, yes. It was — clearly, you can consider everything in the record in making your decision about the case. That subsequent colloquy highlights the fact that there is no prejudice. And in the context of Rule 11 or a change of plea, prejudice means that the defendant wouldn't have pled guilty, basically. And there is — again, there's no evidence of that. And the subsequent colloquy on March 5th confirms that. But what if my — what if my conclusion were not merely that there was a violation of Rule 11, because if all we have is a violation of Rule 11, harmless error, in fact, will let lots of small things slide. But what if our conclusion is that this is not only a violation of Rule 11, but also a violation of due process? Then what's our — then what is our harmless error standard? Our harmless error standard is the government has to burden beyond a reasonable doubt. Yeah. And that's — that gets harder. It does get hard, but not impossible. Yeah. And how about the first day? The first day is the harder one for you. I think the first day, again, though, you've got that subsequent colloquy where they're asked individually. But what are they asked in the subsequent colloquy? They're not asked all the questions. They're not asked all the questions. But if, in fact, again, they've got their attorney there with them. The attorney has a — has a job to do in these proceedings, too, the defense attorney. There's no — nobody disputes that. If, in fact, there was a problem, if, in fact, it was, excuse me, Judge, my client doesn't want to plead guilty, excuse me, Judge, my client isn't guilty, excuse me, Judge, my client didn't understand his rights, there's none of that in this — in this scenario. And in — because of that, I mean, the judge can only respond to the problems the defense attorney raises. And — and when the judge has a colloquy prior to that where everything seems to go fine from what the magistrate can see and hear, the absence of that kind of direct pointing out of a problem indicates, I think, conclusively, that a problem actually doesn't exist. And then the second day, the March 6th hearing, you've got the magistrate asking the defense attorney up front, is there any problem, basically, and the attorney says no. Now, here's a question that is not necessarily comprised within the conversation that we have so far been having. What if — and this is a what if — that we three judges have not conferred ahead of time on this case? I mean, I do not know what my colleagues think. I don't even know myself what I think. But let's assume that as a panel, we hold that there's a violation of due process in this mass plea, but that we hold that the error is harmless, and that we hold that individualized conversation with this defendant, then an individualized conversation with that defendant, sort of go one by one by one, is required. But the failure to do it with this group of 50 is harmless. Okay. Are we going to do groups of 50 and it's going to be harmless error, or are we going to get the — are we going to get you guys all saying, we got to do it one by one? The U.S. Attorney's Office and the Department of Justice is not going to engage in a practice that the court rules violates the Constitution. Okay. That I can assure you. So going forward, you're not going to come back up here a year from now and say, well, you told us it was harmless error, Judge, so we kept doing it. And that's not how the Department of Justice operates, Your Honor. I didn't think so. I just wanted to check. How would you respond to the argument that it really was structural error? Again, this is not structural error because, again, I'm going back to, this isn't the type of errors that has been held to be structural error. It's — it's — Well, we'd have to find an analogy, but — Right. And I know that — I would — I would — I would basically say I would mischaracterize it with throwing out the rules. What we're doing is — is — is finding a way to comply with the rules in an efficient manner while making sure that the defendants have the due process — their due process rights respected.  I would suggest that, again, the — the — the factor that really protects the defendants in this scenario, in addition to the magistrate's control of the courtroom, is the role of the defense counsel in that case. How many magistrates are there? There's seven in Tucson. How many? Seven. Seven. And they — And you say they do this Monday through Friday, and if they each did them individually, couldn't they get through the day? The — while one magistrate is doing this proceeding, the other magistrates are doing the other aspects of a very busy Federal court caseload in Tucson. It's not like — I mean, for example, it — basically at the same time that this proceeding is going on, there is also the daily initial appearances of the criminal defendants, both felony and misdemeanors. Those can be up to 70 or 80 defendants at a time, too. So you've got that going on. The magistrates in Tucson are responsible for taking up almost all the changes of plea for the district court judges. I think this year we're going to have 3,000 felony cases in Tucson. That keeps them very busy. When you say felony cases, that includes the in and out of the Mexican border, right? The illegal reentry up to deportation is a felony case. I know. But if you take those out of the 3,000, how many do you have left? Oh, 150. Oh, no, no. Probably about 1,200 or so. The next biggest component in the — by far, the vast majority of drug cases, actually. Now, you're obviously not making this argument, but the reductio ad absurdum is we've only got one magistrate, and he or she is so busy we can't possibly comply with due process. No, that's not the argument I'm making. But there's a little bit of that here. You're saying this is a — this is such a difficult situation. We have such high volumes. We've got to do this. Otherwise, we're just overwhelmed. And I confess I'm sympathetic. I mean, there's limited person power, and there's a huge volume of these cases. Yet, there are these requirements of both Rule 11 and due process. And what I'm saying is the magistrates in Tucson do an excellent job of both dealing with the numbers but protecting the defendant's rights. Yeah. I should know this, but I do not. Do we take these pleas only in misdemeanor cases? Do we take them in felony cases? These type of pleas where you've got 50 at a time, those are all actually petty offenses. Now, what's petty offense? Is that a misdemeanor? Petty offense is a misdemeanor, punishable up to six months in prison. But it ends up as a criminal conviction, but not as a felony. It's not a felony. That is correct. It's not a misdemeanor. It's a Class B misdemeanor. A petty offense and a Class B misdemeanor under the federal rules are the same thing. OK. But to your knowledge, felony pleas are never taken this way? Not in this larger group. There are times when maybe three or two or three or four may be taken. Yeah, I view those cases as distinct. No, but not of this scale, no. OK. Why don't we hear from the other side? And it's a little bit artificial for you to have rebuttal time, but we'll give it to you because we want to make sure you get your due process. OK. Are the defense lawyers all public defenders? No, Your Honor. In fact, most of them there are CJA panel attorneys. There are only one or two public defenders that show up each day to participate in this proceeding. Not very voluntarily, but we go. So the others are compensated by the court? That's correct, Your Honor. Your Honor, the general yes response, it's the same response in the record whether there's 17 people being sentenced. It's the same general yes response whether 10 attorneys are being addressed. It's the same general response where the court is addressing 50 people. It makes no distinction. The government is wrong to think that that is a response that is on the record affirmatively demonstrating knowing, intelligent, and voluntary plea. Under the government's test, Dominguez-Bonita's test, Boykin, there wouldn't be enough of a record to show that he didn't want to plead guilty. He really wanted to go to trial. Boykin said nothing at his change of plea proceeding. Well, there's nothing in the record. Right. There's to say we don't have a transcript in Boykin. Correct. But under the government's test, nothing appears in the record showing that he didn't want to plead guilty and that he wanted to go to trial. This record cannot be accepted at face value. That's precisely the problem. And I want to speak to something that Your Honor said, Judge Fletcher. The – if the courts are going to change their procedure to say we're going to get an individual response on all these critical matters, Rule 11 in due process, I submit that still does not comply with the purpose of the rule. The court is going guilty or not guilty, guilty or not guilty, guilty or not guilty, one after the other, all 50. This is not a discourse anymore. This is a one-sided colloquy that does not allow the state of mind of the defendant to even appear on the record. The confusion, as I stated earlier, the nonverbal communication so that I can be here next to my client and see any confusion or hesitation, there are – all the clients are spread out. They're not even next to me. You can't fit. They're shoulder to shoulder. They're over here. There's a couple over here. There's a couple back over here. So you're not even seeing your clients as they respond or don't respond in the general yes? As I stated in my objection on the first day, I said I have six defendants. I cannot see them responding. I stated that to the court in that objection. And that is the case. I cannot see any meaningful communication going on. The real error in the district court's decision is trying to import civil due process standards in this case. We have Boykin and we have Rule 11 that elaborate what's required. It's a real danger to start taking in civil deportation proceedings into this case, run a balancing test, and say because the defense attorney was there, everything's okay. That analysis is wrong. Matthews v. Eldridge does not apply here. Okay. You've run over. So if you have a concluding thought. Your Honor, to see the big picture is to see that the resources have gone to Border Patrol and it hasn't gone to the courts. The courts should not have to short shrift Rule 11 and the Constitution in order to do their job. And I would ask to be instructed not to. How many cases of this kind annually go through Tucson? Ten thousand to 20,000, Your Honor. I extrapolate. The numbers now are actually 70. Seventy what? Seventy thousand? Defendants. They're moving it up. They want 100. Per setting, I see. If you ask him, if you ask him, they want it to move it up to 100. It's 70 now. So you times that by every day. So with that many people, how many more magistrates would we need for individual colloquies? As many are required to do it meaningfully, Your Honor. The rule is going to apply to you. It can apply to U.S. citizens. This Court makes a decision. There's no distinction in the rule between felonies, misdemeanors, petties as to how you do a Rule 11 colloquy or a due process colloquy. So it is certainly, I think, a radical, radical procedure being used. So thank you. Thank you. Mr. Miskol? Just briefly, going directly to Judge Zapata's order that was reversed a couple of the convictions, Judge Zapata overlooked the fact of that subsequent colloquy at the end of the March 5th proceeding. And clearly, the Court should have considered that in determining whether there was a factual basis. I mean, not only do you have the factual basis from the general yes or no, but you also have it at the end of that proceeding. So for that reason, Judge Zapata's order should be reversed. Okay. Thank you. Do you agree that there are 10,000 to 20,000 of these cases? Yes. If you want, this procedure started in approximately January of 2008. Since that time, there have been about 25,000 defendants, approximately. Yeah. And do you agree that while this was 50, there's been some pressure to maybe move it up to 70 or more? Is it up to 70 now? It's currently 70. There is discussions going on to perhaps get it up to 100. But the magistrates have made it clear if it goes to 100, it's going to be two groups of 50. I see. In other words, if it goes to 100, it won't go to 100. Right. It will only be 50 in the courtroom at any one time if it goes to 100. And I said the magistrates have made that abundantly clear to us. Okay. Any further questions from the bench? No. Thank you very much. Interesting and good arguments on both sides. The United States v. Roblero Solis et al. is now submitted for decision. And we are in adjournment for the day. Thank you very much.
judges: Duffy, Noonan, Fletcher W.